IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

KENNETH E. JOSEPH,

                              Plaintiff,                              8:12-CV-146

vs.

CAROLYN W. COLVIN, Acting                              MEMORANDUM AND ORDER
Commissioner of the Social Security
Administration,

                              Defendant.

This matter is before the Court on the denial, initially and upon reconsideration, of plaintiff Kenneth E. Joseph's disability insurance benefits under Titles II and XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 401 *et seq*. and 1381 *et seq*. The Court has carefully considered the parties' filings and the administrative record. For the reasons discussed below, the Commissioner's decision will be affirmed.

## PROCEDURAL HISTORY

This case involves two applications made under the SSA. On September 26, 2008, Joseph applied for disability insurance benefits under Title II, (T10, 134–42), and for supplemental security income benefits under Title XVI. T10, 131–33. Both claims were denied initially and on reconsideration. T62–63, 76–84. Following a hearing on September 20, 2010, the administrative law judge (ALJ) found that Joseph was not disabled as defined under 42 U.S.C. §§ 416(i), 423(d), or 1382c(a)(3)(A), and therefore not entitled to benefits under the SSA. T7–20. The ALJ determined that, although Joseph suffered from several severe impairments, and could no longer perform his past relevant work, he had the residual functional capacity to perform other jobs that existed in significant numbers in the national economy. T7–20.

On March 7, 2012, after reviewing additional evidence, the Appeals Council of the Social Security Administration denied Joseph's request for review. T1–4. Joseph's complaint seeks review of the ALJ's decision as the final decision of the Commissioner under sentence four of 42 U.S.C. § 405(g).

*See* § 1383(c)(3) (decisions of the Commissioner under Title XVI subject to judicial review as provided for in § 405(g)).

## FACTUAL BACKGROUND
### I. Medical and Psychiatric Records

Joseph alleges that he has been disabled as of July 23, 2008, primarily as a result of several mental impairments: depression, anxiety, and bipolar affective disorder (type 2). T31–32, 62–63 167, 217.[1] At the time of the administrative hearing in 2010, Joseph was 45 years old. T20, 131.

### A. Pre-Onset Date Medical and Work History

Joseph has a long history of mental illness and alcohol abuse, which predates his amended onset date by decades. He has experienced depression since the age of 8, and has attempted suicide several times throughout his life. T276, 292. Between 2000 and 2002, Joseph was hospitalized for psychiatric issues on multiple occasions. T277, 292. He has a history of significant alcohol use since at least the mid-1990s and continuing through July 2008. T271, 376. Joseph stated that his mental illness first began to interfere with his ability to work in 1999. T167. Nonetheless, he attended college for 1½ years in 2000 to 2001 (having previously obtained his GED), and from 2003 to 2008 he worked in a variety of positions. T34, 168.

From May 2003 to March 2006, Joseph worked full-time as a front-desk clerk at a hotel. T168, 178, 375. He was fired from this job because of his drinking. T523. From March to October 2006, he worked at the front desk of another hotel. T168. Joseph reported that he lost this job due to excessive absences caused by his mental illness. T160. From 2007 to 2008, he worked part-time for 5 months as a cashier at a drug store and then for 7 months at a food market. T168. And before that he worked for 2 months as a part-time busser/flyer distributor. T168. Joseph reported that he also lost each of these jobs because his mental illness caused him to miss too many days of work. T153–54, 160.

### B. Medical Records: 2008 to 2010

In July 2008, Joseph began working for a traveling carnival. T276. After only 2 weeks, he injured his back, and was fired and abandoned at a

---

[1] In his initial applications, Joseph alleged an onset date of March 1, 2006. T131, 136, 162, 167. Joseph later amended his onset date to correspond to the date he achieved sobriety and actually stopped working. T236. Joseph originally claimed that several physical conditions also contributed to his disability, but the ALJ found these were not sufficiently severe (T13). Joseph does not dispute this finding, and his physical conditions will not be discussed further.

truck stop in Iowa, leaving him homeless. T276, 278, 448. On July 23, he went to the emergency room because he was considering suicide. T276, 448. Joseph was eventually referred to the Lasting Hope Recovery Center, in Omaha, Nebraska, where he was hospitalized until August 6. T259, 271, 449. Upon admission, Joseph was diagnosed with depression and alcohol dependence, and given a global assessment of functioning ("GAF") score of 20 to 25.[2] T279–282. Joseph's condition gradually improved with medication, and his GAF score was raised to 29 on August 6. T273. At that time, he was also diagnosed with bipolar affective disorder (type 2). He was discharged in stable condition and referred to Lutheran Family Services (LFS) for outpatient therapy and psychiatric treatment. T274.

After leaving Lasting Hope, Joseph participated in the Salvation Army's Adult Rehabilitation Center (ARC) program, which provided him with housing. ARC was a "work intensive program" and Joseph worked 8 hours each day in the Salvation Army's shop, taking in clothes and performing similar tasks. T40. Joseph stayed with this program for about 2 months. T40–41, 298. He then found housing through a different Salvation Army program, which helped him obtain general assistance and an apartment, but did not require him to work. T41.

In August 2008, Joseph met for the first time with Licensed Independent Mental Health Practitioner (LIMHP) Ben Czyz, a therapist with LFS. T298. Czyz assessed Joseph's GAF at 47.[3] Thereafter, they began weekly therapy sessions. T303–08. On August 29, Dr. Sriram Ramaswamy, a psychiatrist with LFS, performed a psychiatric evaluation of Joseph. T292–93. Joseph described a strong history of anxiety, and reported that he had used alcohol for many years to self-medicate his depression. Since starting with the Salvation Army, however, he had maintained sobriety. T292. Joseph no longer reported thoughts of suicide. T293. Ramaswamy diagnosed him

---

[2] A GAF score represents "the clinician's judgment of the individual's overall level of functioning," not including impairments due to physical or environmental limitations. *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000) (hereinafter, "DSM–IV–TR"). The GAF scale is divided into ten ranges of functioning, with a score of 100 representing superior functioning. *Id.* at 32–34. A score of 11 to 20 means the subject is in some danger of hurting himself or others. *Id.* at 34. A score in the 21-30 range reflects behavior that is considerably influenced by delusions or hallucinations, or serious impairment in communication or judgment, or inability to function in almost all areas (e.g., staying in bed all day, and having no job, home, or friends). *Id.*

[3] A range of 41 to 50 signifies that the person suffers from "serious" symptoms, such as suicidal ideation, or has "any serious impairment in social, occupational, or school functioning (e.g., no friends, <u>unable to keep a job</u>). DSM–IV–TR at 34 (emphasis supplied).

with major depression and alcohol dependence, and rated his GAF as 50. T293. Joseph attended his final therapy session with Czyz on November 7, 2008. T303. He reported that his depression had decreased, and Czyz agreed that Joseph's condition had improved. T303.

From the time Joseph's condition stabilized in late 2008, through the date of the hearing in 2010, Joseph has generally reported the following symptoms, which have fluctuated in severity: a lack of concentration, energy, and motivation; thoughts of failure; and feeling empty, helpless, and hopeless. He has also experienced sleeplessness and fatigue, racing thoughts, and occasional thoughts of suicide. T191, 217, 236, 273, 313, 370, 385, 387, 398–402, 410, 413, 420, 424, 426, 429, 432, 460, 479, 534, 545. Joseph claimed that being around people made him anxious and worsened his symptoms, and made it difficult for him to concentrate. T191, 236.

In November 2008, Joseph's treatment was transferred to the Douglas County Community Mental Health Center, where he began seeing Dan Brune, an advanced practice registered nurse (APRN). T313–18. At their initial appointment, Brune noted Joseph had poor energy and concentration, and a lack of motivation. T313. Brune diagnosed him with severe major depression disorder (with a rule-out of bipolar affective disorder), and alcohol dependence, and assessed his GAF at 48. T315. Brune referred Joseph to a day rehabilitation program with Community Alliance, which he was supposed to attend at least once every week. T196, 516, 519, 530, 546.

In December 2008, state medical consultant Lee Branham, Ph.D., completed two forms evaluating Joseph's depression and bipolar disorder. T326–30, 333–47. Branham concluded that Joseph suffered from a severe affective disorder which caused marked problems with motivation, attention, and concentration. However, Branham found that it was likely that, by July 2009, Joseph's condition would significantly improve, to the point that he would have only moderate limitations. T328. Shortly thereafter, a second state agency medical consultant, Leif Leaf, Ph.D., reviewed both of Branham's opinions and stated his agreement with them. T352, 355.

On December 23, 2008, Janette Bentley, PLMHP (Provisional Licensed Mental Health Practitioner), provided her impression of Joseph's condition. T196. Bentley was an "Assessment Specialist" with Community Alliance. Joseph had started the day program about 1 month earlier, but his attendance had been sporadic, so Bentley was only able to provide a brief assessment. She stated that Joseph was "at times" unable to attend the day program because of his anxiety and depression, and when he did attend, he had a hard time concentrating. Bentley also noted that Joseph's grooming and hygiene were poor, and that his body odor was very strong. T196. However, Joseph's condition soon improved.

- 4 -

At a therapy appointment with Brune on January 30, 2009, Joseph's dress, grooming, and speech were within normal limits. T358. Brune assessed a GAF score of 55.[4] T359. By the end of February, Brune believed Joseph's depression had moderately improved, but still listed his GAF as 55. T372–33.

In March 2009, Joseph provided a report of his daily activities and symptoms. T215. Joseph wrote that he had no hobbies, although he did study the Bible on a daily basis, and he went to church twice a week. T216, 222–23. Otherwise he generally spent most days watching television. T215, 223. Joseph was able to take care of his personal needs: he prepared simple meals, washed the dishes, and did his laundry. T215 He used the bus for transportation or would ask his pastor for a ride. Joseph bought his groceries at a store near his apartment. T216. However, he needed a payee to help manage his money. T216–17. Other than church, shopping, and his appointments, he did not leave his apartment. T222. He mostly kept himself isolated, and had no friends except those at church. T222. Joseph's symptoms generally remained the same as described above, but going to church and reading helped. T217, 224.

On March 25, 2009, state medical consultant Linda Schmechel, Ph.D., completed a psychiatric evaluation form. T361. Like Branham, she found that while Joseph had a severe mental impairment, it was not expected to last 12 months. T361.

In May 2009, Joseph reported to Brune that his depression was worse and he was anxious about his claim for disability benefits. T370. Despite this, he was attending church more often and going to the day program three times a week. Brune noted that Joseph was taking his medications, and that they were moderately effective in controlling his depression and anxiety. T370–71. Brune raised Joseph's GAF to 55–58. T371. In July, Joseph again reported worse symptoms, and Brune adjusted his GAF to 50–55. T390. However, Joseph denied feeling helpless or worthless, and his housing and activities of daily living remained stable. T389–390. Similarly, in July and August 2009, Joseph reported to his LFS social worker that he was very depressed. T420, 424. But the social worker noted that, "[a]lthough [Joseph] says he is depressed[,] he seems to be managing his depression." T419–20.

In June 2009, staff at the Community Alliance completed an assessment of Joseph's functioning. T534–46. He was still reporting the same general symptoms. T534. Since beginning the day program in November 2008, Joseph's attendance had been minimal, and there were several months where he did not attend at all. T540, 545, 557–575. Joseph explained that he was still struggling with his tendency to isolate himself in his apartment.

---

[4] A GAF score of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM–IV–TR at 34.

T534, 545. However, when Joseph did attend the day program, he was well-kept and clean, polite and respectful, and participated well in group discussions and activities. T537–40, 560. From July to November 2009, Joseph only attended the day program once. T402–423, 547–556. And on November 30, 2009, Joseph dropped out of the day program against professional advice. T516.

From November 2009 to February 2010, Joseph generally reported that his depression had worsened, which he attributed in part to the holiday season. T387, 404–06, 412–13. Throughout this period, Brune worked with Joseph on adjusting his medications, and rated his GAF score as 50–55. T384–88, 398–99, 402, 404, 464. By March 2010, Joseph reported that he was sleeping better and noticing improvement with the new medications, although he had not noticed any real improvement with his depression. T394. In April, Joseph reported more intense racing thoughts and stated he was staying isolated more often. T460–61. Brune adjusted his medications again. Despite Joseph's reported symptoms, Brune raised his GAF to 55–60. In May, although Joseph reported he was "just getting by" and that he was anxious and could not sleep due to racing thoughts, Brune noted his depression and activities of daily living were stable, and assessed a GAF score of 55–58. T458.

In January 2010, Joseph began attending individual therapy sessions with Jay Patil, a licensed mental health professional (LMHP) with LFS. T405, 442. At their first session, Patil noted that Joseph was very open and honest, and appeared to be in a good mood. T442. Joseph described his sessions with Patil as "good" and stated they were building rapport. T394, 397. Over the following months, Patil encouraged Joseph not to isolate himself, to return to church or other social activities, and to get involved with a day program. T395, 438, 440, 482, 487–488. Patil explained that isolation could exacerbate Joseph's depression. T438, 487.

Joseph's social workers also encouraged him to return to the Community Alliance day program. T466, 470, 472, 480. Eventually Joseph contacted the day program to set up an intake appointment so he could begin attending again. T480, 482, 484, 487–88. However, Joseph continued to have a negative attitude about the program. T470, 472, 480. His initial intake appointment was postponed multiple times, as he continued to call in sick. T467, T473, 475, 476. One of Joseph's social workers expressed concern that Joseph was simply calling in sick to avoid going to the program. T467. As of August 2010, the record does not show that Joseph ever followed through with the intake appointment. T466.

On August 4, 2010, Brune assessed Joseph's GAF as 58–60. T455, 457. Brune noted that Joseph's depression had stabilized and that although

Joseph reported increasing anxiety, Brune found it to be under "fair control." T456–57. The next day, Brune also completed several psychiatric evaluation forms. T494–501. Sidney Kauzlarich, M.D., a clinical psychiatrist and Brune's supervisor, co-signed the forms in September. T501, 510, 577. These forms will be discussed briefly in the summary of the ALJ's findings, and more fully in the Court's analysis below.[5]

In September 2010, Joseph responded to interrogatories supplied by the agency. T236. He reported symptoms that were more or less the same as above, and that his medications were somewhat effective, but he was still having difficulty sleeping. T236–37. Joseph stated that, at times he could barely leave his apartment, because his depression kept him "locked in and paranoid." T236. He occasionally experienced blackouts where he would not remember what he had done for the past hour. T236. Joseph wrote, "I can't be around people. The anxiety makes me unable to think, my stomach ulcers kick in." T236. Joseph also summarized his recent daily activities. He was still able to take care of himself. T239–40. On an average day, he stated, "[s]ometimes I'll work on the computer. I keep a journal. I watch TV, eat, do a little bit of cleaning." T240. He reads on the computer for about an hour throughout the day, usually reading the news. T240.

The record also contains a letter from Joseph's grandmother, Nancy Mills, with whom he lived in 2007. T37, 211–13. This letter is discussed below in connection with the ALJ's decision.

A review of Joseph's GAF scores from 2008 to 2010 provides a helpful overview of his conditions and how they changed. As the following table shows, Joseph's lowest levels of functioning lasted only briefly, and by early 2009, he was consistently rated in the "moderate" range.

---

[5] Following the hearing before the ALJ, Kauzlarich submitted a letter explaining the evaluations submitted by him and Brune. This letter will also be considered below.

**Joseph's GAF Scores, 2008 to 2010**

| Date | Score | Evaluator | Transcript |
|:---:|:---:|:---:|:---:|
| 7/2008 | 20-25 | Roger J. Pentzien, M.D. (neuropsychiatrist) and Aly S. Hassan, M.D. | T280, 282 |
| 8/2008 | 29 | Mark J. Diercks, M.D. | T273 |
| 8/2008 | 47 | Czyz | T298 |
| 8/2008 | 50 | Ramaswamy | T293 |
| 11/2008 | 48 | Brune | T315 |
| 1/2009 | 50, 55 | Brune | T359, 392 |
| 2/2009 | 55 | Brune | T372–73 |
| 5/2009 | 55–58 | Brune | T370–71 |
| 7/2009 | 50–55 | Brune | T390 |
| 1/2010 | 50 | Patil | T489 |
| 1/2010 | 50–55 | Brune | T388 |
| 2/2010 | 50–55 | Brune | T464 |
| 4/2010 | 55–60 | Brune | T461 |
| 5/2010 | 52 | Patil | T489 |
| 5/2010 | 55–58 | Brune | T458 |
| 8/2010 | 58–60 | Brune | T455, 457 |

### C. Hearing Testimony

The ALJ held a hearing on September 20, 2010, and received testimony from Joseph and the vocational expert (VE), Anita Howell. T26–61. Joseph testified regarding his symptoms and his daily routine, and this generally mirrored his previous statements on these subjects. T42, 44, 48–49. Joseph testified that his medications had helped him, but were not helping much with his depression and racing thoughts. T45–46. The racing thoughts made it difficult for him to focus and concentrate, and he was often nervous and had poor memory. T46. Joseph explained that his symptoms would interfere with jobs such as his former hotel positions, because he would not want to be around people, and would not be able to focus. T47. He stated there were times when he zoned out for a couple hours and would not remember what had happened. T47.

The ALJ asked if Joseph could handle a job such as cleaning offices at night, where he might run into a coworker once or twice during the night but

was mostly alone, doing the same simple tasks. T47. Joseph responded that if his depression was severe, he would not be able to show up, and this poor attendance would get him fired. T47. He explained that about once or twice a month, his depression was so severe he was unable to get out of bed for days. T44–45. Joseph also believed that he would lack the focus necessary to do this sort of job. T48.

### STANDARD OF REVIEW

The Court reviews a denial of benefits by the Commissioner to determine whether the denial is supported by substantial evidence on the record as a whole. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011) (citing 42 U.S.C. § 405(g)). Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion. *Id*. The Court must consider evidence that both supports and detracts from the ALJ's decision, but will not reverse an administrative decision simply because some evidence may support the opposite conclusion. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). If, after reviewing the record, the Court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. *Id*. The Court reviews for substance over form: an arguable deficiency in opinion-writing technique does not require the Court to set aside an administrative finding when that deficiency had no bearing on the outcome. *Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir. 2011). And the Court defers to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011).

Where the claimant submits evidence to the Appeals Council that was not previously submitted to the ALJ, the new evidence becomes part of the administrative record before the Court. *Nelson v. Sullivan*, 966 F.2d 363, 366 (8th Cir. 1992). If, as here, the Appeals Council considered the new evidence but declined to review the ALJ's decision, the Court does not evaluate the Council's decision to deny review, but determines whether the record as a whole, including the new evidence, supports the ALJ's determination. *Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000); *see also Van Vickle v. Astrue*, 539 F.3d 825, 829 n.2 (8th Cir. 2008). The Court must decide how the ALJ would have weighed the new evidence had it existed at the initial hearing. *Bergmann v. Apfel*, 207 F.3d 1065, 1068 (8th Cir. 2000). But the general rule still applies: even if the new evidence is substantial and supports a contrary decision, the Court may not reverse the ALJ's decision if it is supported by substantial evidence. *Id.*

## SEQUENTIAL ANALYSIS AND THE ALJ'S FINDINGS

To determine whether a claimant is entitled to disability benefits, the ALJ performs a five-step sequential analysis. 20 C.F.R. § 404.1520(a)(4).

## I. Step One

At the first step, the claimant has the burden to establish that he has not engaged in substantial gainful activity since his alleged disability onset date. 20 C.F.R. § 404.1520(a)(4)(i); *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006).[6] If the claimant has engaged in substantial gainful activity, the claimant will be found not to be disabled; otherwise, the analysis proceeds to step two. § 404.1520(a)(4)(i); *Gonzales*, 465 F.3d at 894.

In this case, the ALJ found that Joseph had not engaged in substantial gainful activity since his alleged disability onset date, and that finding is not disputed on appeal. T12.

## II. Steps Two and Three

At the second step, the claimant has the burden to prove he has a "medically determinable physical or mental impairment" or combination of impairments that is "severe[,]" 20 C.F.R. § 404.1520(a)(4)(ii), in that it significantly limits the claimant's physical or mental ability to perform basic work activities. *Gonzales*, 465 F.3d at 894; *see also Kirby v. Astrue*, 500 F.3d 705, 707–08 (8th Cir. 2007). Next, at the third step, if the claimant shows that any impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits. *Gonzales*, 465 F.3d at 894; § 404.1520(a)(4)(iii). Otherwise, the analysis proceeds.

For mental impairments, at steps two and three of the sequential analysis, the ALJ utilizes a two-part "special technique" to evaluate a claimant's impairments and determine, at step two, whether they are severe, and if so, at step three, whether they meet or are equivalent to a "listed mental disorder." § 404.1520a(a), (d)(1) and (2). The ALJ must first determine whether the claimant has a "medically determinable mental impairment(s)." § 404.1520a(b)(1). If any such impairment exists, the ALJ must then rate the degree of "functional limitation" resulting from the impairment. 20 C.F.R. § 404.1520a(b)(2). This assessment is a "complex and highly individualized process that requires [the ALJ] to consider multiple issues and all relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation." § 404.1520a(c)(1).

---

[6] Titles II and XVI have separate regulatory schemes (*compare, e.g.*, § 404.1501 *with* § 404.1501), but there are no material differences in the regulations applicable to Joseph's claims, so the Court cites only the regulations pertaining to Title II.

Four "broad functional areas" are used to rate these limitations: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." § 404.1520a(c)(3). These areas are also referred to as the "paragraph B criteria," which are contained in 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00 *et seq*. The first three criteria are rated using a five-point scale of none, mild, moderate, marked, and extreme. § 404.1520a(c)(4). The fourth criterion, episodes of decompensation, is rated as: none, one or two, three, four or more. *Id*.

After rating the degree of functional limitation resulting from any impairments, the ALJ determines the severity of those impairments (step two). § 404.1520a(d). Generally, if the first three functional areas are rated as "none" or "mild" and the fourth area as "none," the ALJ will conclude that any impairments are not severe, unless the evidence indicates otherwise. § 404.1520a(d)(1). If any impairments are found to be severe at step two, the ALJ proceeds to step three, and compares the medical findings about the impairments and the functional limitation ratings with the listing criteria for each type of mental disorder in 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00 *et seq*.

In this case, at step two, the ALJ found that Joseph had severe impairments of bipolar II disorder, depression, anxiety, and alcohol dependence in remission. T12. At step three, the ALJ found that none of these impairments met or equaled a listed impairment. T13–14. Joseph does not dispute this finding on appeal. However, in arriving at that conclusion, the ALJ found that Joseph experienced no more than moderate limitations in the paragraph "B" criteria. T13. Joseph argues that this is not supported by the record, but this argument is actually directed at the next step of the ALJ's analysis.

### III. Residual Functional Capacity

Before moving to step four, the ALJ must determine the claimant's residual functional capacity (RFC), which is then used at steps four and five. 20 C.F.R. § 404.1520(a)(4). "'Residual functional capacity' is defined as 'the most [a claimant] can still do' despite the 'physical and mental limitations that affect what [the claimant] can do in a work setting' and is assessed based on all 'medically determinable impairments,' including those not found to be 'severe.'" *Gonzales*, 465 F.3d at 894 n.3 (quoting § 404.1545).

To determine a claimant's RFC, the ALJ must consider the impact of all the claimant's medically determinable impairments, even those previously found to not be severe, and their related symptoms, including pain. §§ 404.1529(d)(4) and 404.1545(a)(1) and (2). This requires a review of "all relevant evidence" in the case record. 20 C.F.R. § 404.1545(a). Although

the ALJ is responsible for developing the claimant's complete medical history, § 404.1545(a)(3), the claimant bears the burden of proof to demonstrate his or her RFC. *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000).

The RFC assesses the claimant's ability to meet the physical, mental, sensory, and other requirements of work. § 404.1545(a)(4). For mental impairments, the RFC determination involves a detailed assessment that itemizes the broad paragraph "B" criteria used at step two (e.g., "activities of daily living" and "social functioning") into more specific mental requirements of work. Social Security Ruling (SSR) 96-8p: Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims. These requirements include, among other things, the ability: to understand, remember, and carry out instructions; to respond appropriately to supervision, coworkers, and work pressures in a work setting; to use judgment in making work-related decisions; and to deal with changes in a routine work setting. §§ 404.1545(c) and 404.1569a(c); *SSR 96-8p*. All limits on work-related activities that result from a claimant's mental impairments must be included in the RFC. SSR 85-16: Titles II and XVI: Residual Functional Capacity for Mental Impairments.

A special procedure governs the ALJ's evaluation of a claimant's symptoms. The ALJ first considers whether the claimant suffers from "medically determinable impairment(s) that could reasonably be expected to produce [the claimant's] symptoms." § 404.1529(a) to (c)(1). A medically determinable impairment must be demonstrated by medical signs or laboratory evidence. § 404.1529(b). If this step is satisfied, the ALJ then evaluates the intensity and persistence of the claimant's symptoms to determine how they limit the claimant's ability to work. § 404.1529(c)(1). This again requires the ALJ to review all available evidence, including statements by the claimant, objective medical evidence, and "other evidence."[7] § 404.1529(c)(1) to (3). The ALJ then considers the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, and evaluates them in relation to the objective medical evidence and other evidence. § 404.1529(c)(4). Ultimately, symptoms will be determined to diminish the claimant's capacity for basic work activities, and thus impact the claimant's RFC, "to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms . . . can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id*.; § 404.1529(d)(4).

---

[7] "Other evidence" includes information provided by the claimant, treating and non-treating sources, and other persons. See § 404.1529(a)(1), and the sections referred to therein, as well as § 404.1529(c)(3).

In assessing the credibility of a claimant's subjective testimony regarding his or her alleged symptoms, the ALJ must weigh a number of factors. *See, Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009); § 404.1529(c)(3)(i–vii).*[8] When deciding how much weight to afford the opinions of treating sources and other medical opinions regarding a claimant's impairments or symptoms, the ALJ considers a number of factors set forth in 20 C.F.R. § 404.1527.

In formulating Joseph's RFC, the ALJ considered Joseph's treatment and progress, from his hospitalization for suicidal thoughts in 2008, up to the date of the hearing, and found that Joseph's condition had significantly improved. T15–17. The ALJ summarized Joseph's treatment notes with Brune and Patil and the notes of the LFS social workers. T16–17. These showed that Joseph's mental conditions had stabilized, he had achieved and maintained sobriety, he was living more or less independently, and that he was overall "doing much better" with a GAF of (up to) 60. T15. Additionally, Joseph reported that his medications were somewhat effective and caused no side effects. T14.

This improvement was also reflected in Joseph's activities of daily living. Whereas in 2008, Joseph had poor grooming and hygiene, by early 2009 and through the date of the hearing, Joseph was living more or less independently and taking care of himself. T16–17. He prepared simple meals, did his own laundry and dishes, kept his apartment tidy, was able to use his computer, and attended church on a fairly regular basis. He was also able to go grocery shopping.[9] T17

The ALJ carefully considered Joseph's statements regarding the effects of his mental impairments. Joseph claimed his anxiety and depression interfered with his ability to focus and concentrate, that he was nervous and often isolated himself, and that he experienced fear attacks, a lack of interest in hobbies, no energy, a sense of emptiness, and feelings of suicide and failure. T14–15. He claimed that he could not be around people, especially crowds, and that his anxiety made it difficult to think. T14–15. Joseph reported that he barely left his apartment at times because his depression

---

[8] In assessing a claimant's credibility, the ALJ should consider the so-called *Polaski* factors: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. *Moore, 572 F.3d at 524* (citing *Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).*

[9] Joseph generally had his landlord or social worker go with him to the store. But, as he explained, that was because he was nervous about going out alone in his neighborhood, which he claimed had a high crime rate. T17, 48–49.

kept him locked in and paranoid. He did not sleep much, and 1–2 days each month he could not get out of bed due to his depression.

Ultimately, the ALJ found that Joseph had the RFC to perform the full range of work at all physical exertional levels, but was limited to unskilled work that was routine, repetitive, and did not require extended concentration, dealing with changes, or goal setting. T14. Additionally, Joseph was limited to no more than occasional, brief, or superficial social interaction with coworkers, supervisors, or the general public. T14. In reaching this conclusion, the ALJ found that while Joseph's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," Joseph's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the ALJ's RFC determination. T15.

The ALJ explained several reasons for finding Joseph's statements not entirely credible: they were not supported by the record, and they were inconsistent with the objective evidence, the relief that his treatment had provided, and his reported activities. T15–18. This included the fact that, although Joseph was suffering from the same mental impairments prior to his disability onset date (and was also abusing alcohol), he was able to maintain steady employment at the front desk of two hotels for over 3 years. T17. The ALJ also observed that Joseph had been inconsistent with his treatment. T15. Specifically, Joseph was discharged from the day program due to his poor attendance, and he had missed multiple appointments with Patil. T16–17. The credibility determination also factored in statements made by Joseph to his LFS social workers and at the hearing. In June 2010, Joseph stated that the only reason he was going to return to the day program was because of his pending disability case. T17, 472. And at the hearing, Joseph claimed that he had not looked for work since his amended onset date because, in part, Brune had told him he could not do well enough around people to work. T18, 38–39. But Brune never made such a statement, nor did he or Patil ever restrict Joseph from working. T18.

The ALJ also found support for this RFC in the opinions of the consulting physicians and mental health providers. The ALJ afforded substantial weight to the opinions of the state agency medical consultants Lee Branham, Ph.D., and Linda Schmechel, Ph.D. T17. Both determined that, while Joseph suffered from severe mental impairments in late 2008 and early 2009, his condition was expected to improve within 12 months, and would then cause no more than moderate limitations in functioning. T17. In affording these opinions substantial weight, the ALJ noted that the predictions of improvement were borne out by the record. T17.

The ALJ also considered the report of Joseph's grandmother, Nancy Mills, who Joseph lived with for about 8 months in 2007. T16, T37. Mills reported that her neighbors liked Joseph and that he interacted well with them. T16. The ALJ noted that Mills did not mention any mental health problems, and rated Joseph's concentration as fairly good. T16. The ALJ found Mills' statements credible and afforded them substantial weight. T16.

As the RFC shows, the ALJ did not entirely reject Joseph's claimed limitations. And the ALJ found support for some limitations in other opinions in the record. The ALJ afforded substantial weight to the report of Janette Bentley, PLMHP, from Community Alliance. T16. In December 2008, Bentley observed that Joseph had limitations in being around others, poor grooming and hygiene, difficulty concentrating and maintaining focus, and poor medical compliance at times. T16. The ALJ found that Bentley's statement supported limiting Joseph's RFC to unskilled work with limited social interaction. T16.

Finally, the ALJ considered the August/September 2010 evaluation forms filled out by Brune and cosigned by Kauzlarich. Briefly, Brune and Kauzlarich opined that Joseph had marked limitations due to his anxiety (but not his affective disorders). T16–17. They concluded that Joseph had poor abilities in dealing with the public, concentration, and detailed work, but fair abilities in many other areas. T17. The ALJ found their opinion consistent with an RFC for unskilled work and limited social interaction. T17. But the ALJ found the marked limitations in activities of daily living and concentration were not supported by the record and were inconsistent with Brune's contemporaneous treatment notes, including recent GAF scores of up to 60. T17. The ALJ also found that Kauzlarich had not actually participated in Joseph's treatment, but had only supervised Brune. T17. For these reasons, the ALJ afforded their opinions little weight. As will be discussed more fully below, Joseph argues that the ALJ committed numerous errors in arriving at this RFC.

## IV. Steps Four and Five

At step four, the claimant has the burden to prove that he lacks the RFC to perform his past relevant work. § 404.1520(a)(4)(iv); *Gonzales*, 465 F.3d at 894. If the claimant can still do his past relevant work, he will be found to be not disabled, otherwise, the analysis proceeds to step five. At step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy that the claimant can perform. *Gonzales*, 465 F.3d at 894; § 404.1520(a)(4)(v).

In this case, at step four, the ALJ found that Joseph may have been able to perform his past job of busser/flyer distributor. T18, 51–52, 168. But the ALJ nonetheless decided it was appropriate to continue to step five. At that step, the ALJ found, based on the testimony of the vocational expert, that there were jobs that existed in significant numbers in the national economy that Joseph could perform. T18–19. Specifically, the ALJ determined that Joseph was capable of performing about 80–85 percent of the full range of unskilled work, including the representative occupations of industrial janitor, laundry worker, and hospital cleaner. The ALJ therefore concluded that Joseph was not under a disability, and denied his claims for benefits.

## ANALYSIS
### I. Joseph's Credibility

Joseph argues that the ALJ erred in finding that his statements concerning his symptoms were not entirely credible. As discussed above, the ALJ provided several reasons for this finding. First, the ALJ found that Joseph had failed to follow the recommendations of his treatment providers, and was inconsistent in treating his mental illnesses. This finding was based on Joseph's failure to attend the day program as recommended by Brune and Patil, and Joseph's missed appointments with Patil. Joseph argues that this should not have been held against him, because his absences were the result of his depression and anxiety. The Court finds that substantial evidence supported the ALJ's determination, and Joseph's first argument is without merit.

Joseph next argues that the ALJ's overall credibility determination was not supported by substantial evidence. Again, the Court finds no error. The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts. *Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010). The ALJ's credibility determination must be upheld if the ALJ provides good reasons for discounting the claimant's subjective complaints—i.e., inconsistencies in the record, or the *Polaski* factors—and those reasons are supported by substantial evidence. *Gonzales,* 465 F.3d at 895–96. The ALJ cited several proper reasons for finding Joseph less than credible (in addition to his failure to follow his providers' recommendations). As the Court explains below, each was supported by substantial evidence.

### A. Failure to Follow Treatment Recommendations

Joseph does not dispute that failing to follow a recommended course of treatment weighs against a claimant's credibility. *See Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007). Nor does Joseph dispute that Patil advised him

that isolating himself would only worsen his depression, and that attending the day program could help, or that Brune and his social workers also encouraged him to attend.

Instead, Joseph argues that his absences were manifestations of his depression and anxiety, which kept him isolated and unable to leave his apartment. He relies on *Pate-Fires v. Astrue*, 564 F.3d 935 (8th Cir. 2009). In *Pate-Fires*, the court held that it was improper to hold a claimant's treatment noncompliance against her, when it was a manifestation of her severe schizoaffective disorder, which deprived her of the rationality to even decide whether to continue treatment. 564 F.3d at 945–46.

Joseph acknowledges that he knew it was in his best interest to take his treatment seriously. In addition to the recommendations and encouragement of his treatment providers, his attorney warned that not following through with treatment could hurt his chances of obtaining disability benefits. T467, 484. But, he argues, that simply proves his point— the fact that he was acting against his own interest shows that his actions were manifestations of his mental illness, which lead to "avoidant behaviors, negative thinking patterns[,] and defeatist/hopeless outlooks[.]" Filing 16 at 14.

However, in *Pate-Fires* there was "overwhelming" evidence that the claimant's noncompliance was attributable to her mental illness. 564 F.3d at 945–46. With one exception, the only evidence here comes from Joseph's own statements.[10] Joseph reported that the large groups at the day program made him anxious. T32—33, 42, 552, 560. And on various occasions he stated he was too depressed or anxious to attend, or was having trouble sleeping, or was simply unable to overcome his urge to stay isolated. *See, e.g.*, T417, 470, 473, 477, 534, 540, 545.

But notes from Joseph's social workers also show that he may simply have been avoiding the day program because he did not want to participate. Joseph postponed his intake appointment with the day program multiple times, claiming he was sick. But one social worker expressed concern that Joseph was simply calling in sick to avoid going. T467, 473, 475, 476. The record also shows that Joseph generally had a negative attitude about attending the day program. T467, 470, 476, 477. And in June 2010, Joseph

---

[10] In December 2008, Bentley stated that Joseph was "at times" unable to attend the day program because of his anxiety and depression. T196. But Bentley's statements were made during the period when Joseph's symptoms were at their peak and his functioning at its lowest levels. In the months following this assessment, Joseph's condition improved significantly. *Compare* T196, 313–315 *with* T358–59, 370–73. Bentley's statement does not explain Joseph's continued absences from 2009 to 2010, nor does it explain his missed appointments with Patil.

told a social worker that the only reason he would follow through with attending was because of his pending disability claims. T472. Moreover, Joseph has not explained his irregular attendance with Patil. Unlike the group programs at the Community Alliance, his therapy sessions with Patil were one-on-one, and Joseph does not claim he experienced any anxiety about these sessions. In sum, Joseph's case is readily distinguishable from *Pate-Fires*, and the ALJ properly factored Joseph's noncompliance with his treatment into her credibility assessment.

Ultimately, Joseph's sporadic attendance only matters in that it factored into the ALJ's overall credibility determination. And as the Court explains next, this determination was supported by proper reasons and substantial evidence.[11]

### B. The ALJ's Credibility Assessment

The ALJ found several reasons for discounting Joseph's credibility, and the Court finds no error in the ALJ's overall decision or the underlying reasons. First, the ALJ properly observed that Joseph's statements regarding his symptoms were inconsistent or lacking support in the record. For example, when asked why he had not looked for a job since achieving sobriety, Joseph answered "Basically, I can't be around people. I just -- especially large numbers of people -- I just totally break down anymore." T38–39. But these statements were contradicted by notes from the Community Alliance, which reported that Joseph participated well in group discussions and activities at the day program. T537–40, 560. Joseph's ability to participate well, despite the "crowded" and "sometimes very large[,] congested group conditions" at the program, casts doubt on his claim that he would break down around people. T31–33, 42.

The ALJ noted that most of Joseph's past jobs had required interpersonal skills, and involved working with the public, and asked if he had tried to find a job that did not involve working with people. T39. Joseph responded, "I've looked for them, you know, but everywhere I go, there's more people." T39. Joseph then admitted that he was not looking for work in Omaha. T39. When asked why, he responded that Brune had told him he "wouldn't be allowed to be around people that long." T39. But as the ALJ noted, this was not borne out by the record, and there is no evidence Brune (or Patil) restricted Joseph from being around people or seeking employment. T18.

---

[11] So, even if Joseph's noncompliance was caused, in whole or in part, by his depression and anxiety, the Court is not convinced that this would have materially affected the ALJ's overall finding.

Joseph stated he had never been able to hold down a job. T43. The ALJ responded that Joseph had worked for (nearly) 3 years at a hotel. T43. Joseph explained that "My depression and everything hadn't hit me and stuff." T43. But the record, including Joseph's own statements at the same hearing, showed that he suffered from depression and anxiety even prior to 2003.[12] T36–37. More importantly, Joseph's ability to work despite his mental illness casts doubt on his claim that these same mental illnesses now render him disabled.[13] *See, Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th Cir. 2005); *Goff v. Barnhart,* 421 F.3d 785, 792–93 (8th Cir. 2005).

Finally, after being discharged from in-patient psychiatric treatment in the fall of 2008, Joseph was able to participate in the Salvation Army's ARC program for about 2 months, which required him to work 8 hours each day in the Salvation Army's shop, taking in clothes and performing similar tasks. T40–41, 298. The ALJ asked why Joseph had stopped working after October 2008. T41. Joseph responded that he could not be around people, especially crowds. T41. That prompted the following exchange:

| | |
|---|---|
| ALJ: | But you did work in the back room, it sounds like, for three [sic] months; is that the kind of work you can do? |
| Joseph: | I don't think I could do that now. |
| ALJ: | Why -- you can't do it now but you could do it then? |
| Joseph: | I had to do it then to stay in the program. |

T41.

Joseph's ability to work when necessary—with no apparent effect on his mental stability—casts doubt on his claim that his mental conditions are disabling. Disability is measured by what a claimant can do, despite his or her physical or mental impairments, *see Gonzales,* 465 F.3d at 894 n.3, not what a claimant is willing to do. And here, the ALJ properly found that Joseph could do more than he claimed. Notwithstanding this finding, the

---

[12] Joseph previously stated that his mental illness first began to interfere with his ability to work in 1999 (T167), that he was hospitalized for mental illness between 2000 and 2002 (T277, 292), and that he had a long history of depression and suicide attempts dating back to his childhood. T276, 292.

[13] Joseph explained elsewhere that while his mental illnesses affected him for many years, the symptoms became worse when he lost his insurance in 2006 and was unable to afford his medication. T137. Even so, from 2006 to 2008, Joseph worked in three positions that he maintained for approximately 6 months apiece. T168. Nor is this argument persuasive when it comes to Joseph's ability to work post-onset date, as he has been consistently taking his medications since 2008.

Court does not doubt that Joseph's mental illnesses have greatly interfered with his life. And, like the ALJ, the Court commends Joseph for working hard to achieve sobriety and to find some measure of peace. However, the ALJ provided several reasons for finding Joseph's statements not entirely credible, and the Court finds no error in the ALJ's reasoning or decision.

## II. Joseph's Residual Functional Capacity

Joseph next argues that the ALJ committed a variety of errors in determining his RFC. Joseph argues that the ALJ erred in (1) finding his condition had significantly and sustainably improved; (2) failing to find that Brune and Kauzlarich were "treating sources" or otherwise refusing to give their opinions controlling weight; (3) drawing erroneous conclusions from his activities of daily living; (4) improperly weighing the statements of Janette Bentley and his grandmother; and (5) failing to perform a function-by-function analysis of his RFC. The Court finds that each argument is without merit.

Joseph's first argument, that the ALJ erred in finding his condition had improved, is beside the point. Joseph does not dispute that his condition had improved since his suicidal low point in July 2008. Filing 16 at 16. Instead, Joseph is really arguing that, even after his condition improved, the RFC understated the impact of his mental impairments—in other words, that the RFC was not supported by substantial evidence. That argument will be considered below, and further discussion on his improvement, standing alone, is not warranted. Joseph's remaining arguments can be considered more efficiently after a review of the ALJ's overall RFC determination. The Court finds that, contrary to Joseph's overarching argument, the ALJ did not err in formulating Joseph's RFC.

As discussed above, the ALJ found that Joseph was limited to unskilled work that was routine and repetitive; did not require extended concentration, dealing with changes, or goal setting; and involved no more than occasional, brief, or superficial social interaction with coworkers, supervisors, or the general public. T14. Joseph's main objection is that the ALJ erred in not affording more weight to the opinions of Brune and Kauzlarich. Brune was Joseph's primary treatment provider, and he and Kauzlarich were the only sources to opine that Joseph's limitations were greater than those found by the ALJ. So, their opinions, and what the ALJ made of them, are central to this case.

## A. Brune and Kauzlarich's Opinion

The evaluations filled out by Brune in August 2010 and countersigned by Kauzlarich in September consisted of three separate checklist forms.

T494–513. The first two forms were psychiatric evaluations (the "PE forms") that corresponded to the criteria used by the Commissioner to assess the severity of a claimant's mental impairments at step two and to determine whether an impairment meets or equals listing criteria at step three. The first form related to affective disorders, i.e., depression and bipolar disorder (listing 12.04), and the second addressed anxiety-related disorders (12.06). T494, 502; 20 C.F.R. Part 404, Subpart P, Appx. 1, §§ 12.04, .06.

Brune found that Joseph's anxiety disorder resulted in more severe symptoms and limitations than his affective disorders. The PE forms asked whether Joseph's conditions resulted in impairments in three of the broad paragraph "B" criteria: activities of daily living, social functioning, and concentration, persistence, or pace. T497–99, 506–08; *see* § 404.1520a(c)(3). These were further divided into specific functions, which were rated using the same five-point scale as in step two: none, mild, moderate, marked, and extreme. *See*, §§ 404.1520a(c)(4), 404.1545(c), and 404.1569a(c); *SSR 96-8p*.

On the form for affective disorders, Brune found no impairments in any of the three paragraph B criteria, not even "slight" impairments. T497–99. In contrast, on the anxiety form, Brune found marked impairments in all three categories.[14] T507–08. More specifically, under activities of daily living, Brune checked the items for grooming, personal hygiene, maintenance, shopping, cooking, cleaning, paying bills, planning daily activities, and initiating and participating in activities. T507. Under social functioning, he found marked limitations in (among other things) communicating clearly and effectively, cooperating with coworkers, responding to supervision, holding a job, and interacting and actively participating in group activities. T507–08. Finally, under concentration, persistence, and pace, Brune found marked limitations in every sub-category, including (among others): independent functioning, concentration, and the ability to assume the increased mental demands associated with competitive work. T508.

Finally, the PE forms asked whether Joseph had displayed certain conditions in stressful circumstances. T499, 509. Brune checked several items on the anxiety form, including: withdrawal from situations, exacerbation of symptoms and deterioration of functioning, poor attendance and decision-making, and inability to cope with schedules and adapt to changing demands. T509. Brune did not check any of these items on the form for affective disorders. T499.

---

[14] "Marked" was defined on the sheet as the "range between moderate and extreme. With a marked limitation the person cannot perform the function independently <u>and</u> appropriately <u>and</u> effectively <u>and</u> on a sustained basis." T506. This generally corresponds to the definition provided in Social Security regulations. 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00.C; *see also* § 404.1520a(c)(4).

The third form rated Joseph's mental and emotional capabilities in "day-to-day work settings." T511. Unlike the previous forms, which asked whether Joseph had experienced certain symptoms or impairments, this form was concerned with Joseph's (then-current) ability to work. *Compare* T496–97, 507–08 *with* 511. This "work capacity" form measured Joseph's abilities using a five-point scale, from lowest to highest: none, poor, fair, good, unlimited. T511. The form contained three broad categories: "making occupational adjustments," "making performance adjustments," and "making social adjustments." T511–12. Each contained subcategories addressing more specific work abilities. Brune rated all of Joseph's abilities as either "fair" or "poor." T511–12. "Fair" meant the ability to function was "limited but satisfactory," while "poor" meant the ability was "seriously limited but not precluded." T511 (emphasis supplied).

Under occupational adjustments, Brune rated as poor Joseph's abilities to deal with the public and handle work stresses, and to maintain attention and concentration. T511. But he rated as fair Joseph's ability to follow work rules, relate to coworkers, interact with supervisors, use judgment, and function independently. T511. The next category, "making performance adjustments," measured the ability to carry out instructions that were (1) complex, (2) detailed but not complex, or (3) simple. T512. Brune rated Joseph as poor in each. Finally, under social adjustments, Joseph was rated as poor in maintaining his personal appearance and relating predictably in social situations, but as fair in behaving in an emotionally stable manner and demonstrating reliability. T512.

Overall, the ALJ found that Brune's opinion—and Kauzlarich's concurrence—were not entitled to great weight. But the ALJ generally afforded more weight to the opinions expressed on the work capacity form than those in the PE Forms. The ALJ found the limits in the work capacity form were generally consistent with the RFC for unskilled work and limited social interaction. T17. In contrast, the ALJ found that the marked limitations for activities of daily living and concentration set forth in the PE form for anxiety disorders were not supported by the record and were inconsistent with Brune's contemporaneous treatment notes, including his recent findings of GAF scores of up to 60. T17. The ALJ also noted that Kauzlarich did not actually participate in Joseph's treatment, but only supervised Brune. T17.

Joseph argues that the ALJ erred by not giving greater weight to the opinions of Brune and Kauzlarich, and in particular the PE form showing marked limitations. He points to a letter written by Kauzlarich and submitted following the ALJ's decision. In the letter, Kauzlarich explained that

> [w]hen completing checklists and other statements in connection with disability claims, we [Douglas County clinical staff] often rate as "marked" the patient's limitations in several areas of functioning. However, in our clinic notes, we may rate the same patient as having a GAF score in a range between 50 and 60, which, as defined by the DSM-IV, reflects a "moderate level" of impairment.

> When completing reports for a Social Security Administration or State Disability claim, we are judging how the patient would function in the context of full-time employment. This is our understanding of how the Social Security Administration . . . judges the person's "disability," i.e., the ability to work. The question is, can the patient perform the specific function independently <u>and</u> appropriately <u>and</u> effectively <u>and</u> on a sustained basis. When we find the person's limitation in the area to be "marked" this would translate to a GAF score below 50. That same person may have a clinical GAF score of 50 or higher, but this is judging how the person is functioning in the context of <u>not</u> working: when he or she does not have to contend with the demands of a full-time job.

T577. So, Joseph argues, there was actually no inconsistency between the anxiety-related disorders form and Brune's earlier GAF scores and treatment notes, and the ALJ should have credited the marked limitations Brune predicted would return if Joseph resumed full-time work.

The Court must decide how the ALJ would have weighed the opinions contained in the PE and work capacity forms, had Kauzlarich's letter been available at the initial hearing. *Bergmann v. Apfel*, 207 F.3d 1065, 1068 (8th Cir. 2000). The ALJ credited the work capacity form over the PE forms, because the marked limitations in the latter were not supported by the record. The Court finds that the ALJ's decision is readily reconciled with Kauzlarich's letter, and that the letter would not have materially affected the ALJ's decision.

Kauzlarich's letter explains why the PE forms were inconsistent with Brune's contemporaneous treatment notes. But Kauzlarich failed to explain why the PE forms were inconsistent with the work capacity form. If Brune and Kauzlarich intended the PE forms to rate Joseph's symptoms and limitations in the context of full-time employment, then the PE forms should have been consistent with the work capacity form. But that was not the case.

Instead, the work capacity form did not contain the limitations one would expect given the limitations expressed on the PE form.

For example, the anxiety PE form listed "marked" limitations in cooperating with coworkers and responding to supervision. T507. Yet the work capacity form rated Joseph as "fair" in relating to coworkers and interacting with supervisors. T511. While these forms were measuring slightly different functions ("cooperating with" versus "relating to"), and using slightly different rating metrics, the disparity between "fair" and "marked" calls out for some explanation.[15] But no explanation was given. Similarly, on the PE form Brune found marked limitations in "independent functioning," but found a fair ability to "function independently" on the work capacity form. *Compare* T508 *with* T511.

Given these inconsistencies, and the lack of an explanation, the ALJ was entitled to credit the work capacity form over the PE forms. It is the ALJ's role to resolve conflicts among the opinions of various treatment providers. *Renstrom v. Astrue*, 680 F.3d 1057, 1065 (8th Cir. 2012). The work capacity form more directly addressed the impact of Joseph's symptoms on his ability to perform basic work functions (as opposed to the severity of the symptoms alone) and the Court finds no error in affording it greater weight. And as the Court next explains, while the record supported some but not all of the limits on the work capacity form, it did not support the marked limitations on the PE forms.

The RFC incorporated the findings on the work capacity form that Joseph had poor abilities in dealing with the public and work stresses, maintaining concentration, and relating predictably in social situations. The remainder of the limitations on the work capacity and PE forms were not supported by the record. For example, Brune's opinion that Joseph had a poor ability to follow even simple job instructions has no basis other than Joseph's subjective statements that he found it difficult to concentrate, which the ALJ properly found less than credible. At various times, Joseph was able to study the Bible, keep a journal, and read news on the computer for about an hour a day. T216, 223, 240. From approximately February to May 2010, Joseph took the initiative to find and participate in an internet support group for people with mental illnesses. T395, 478. While these activities do not alone prove Joseph had any particular ability to concentrate on a sustained basis, they are not consistent with an inability to follow even simple job instructions.

---

[15] As noted above, a "marked" limitation meant that Joseph <u>could not</u> perform the function independently, appropriately, effectively, and on a sustained basis (T506), while "fair" meant the ability to function was "limited <u>but satisfactory</u>." T511 (emphasis supplied). A marked impairment would correspond more appropriately to a rating of "poor" (i.e., the ability was seriously limited but not precluded). T511.

Nor does the record support Brune's finding of marked impairments in concentration, persistence, and pace. T508. The VE testified that Joseph's past job as a hotel clerk required the use of tact and diplomacy in dealing with the general public, operating a computer accurately, and keeping records. T241. Operating a computer throughout the day and keeping records are tasks that require concentration, and Joseph was able to do these despite suffering from the same mental illnesses and a drinking problem. Even if Joseph's condition had deteriorated since then, this was accounted for in the RFC, which limited him to simple jobs. These concentration deficits are also inconsistent with Joseph's ability to participate well in group activities and discussions at the day program. T537–40, 560. Finally, Brune did not support his opinion with any clinical findings or tests. T499, 508, 511–12.

Similarly, there was no basis in the record for Brune's finding that Joseph's activities of daily living (such as grooming) would deteriorate to marked levels of impairment if Joseph had to return to work. The only evidence of such marked impairments was immediately following Joseph's release from inpatient psychiatric care. Thereafter, he was more or less able to care for himself. Nor is there any evidence that Joseph experienced problems with his activities of daily living when he was working from 2003 to 2008. Instead, his grandmother stated that in 2007 (when he was supposedly doing worse, having lost his medical insurance) his grooming was normal and his ability to do chores was "fairly normal." T211–212.

In short, the Court finds no error in the ALJ's RFC determination. The ALJ did not summarily reject Joseph's claimed limitations, but carefully considered them together with the entire record, and accepted those functional limitations supported by substantial evidence. Having found the RFC determination was supported by substantial evidence and proper reasoning, Joseph's remaining arguments are readily disposed of.

### B. Brune and Kauzlarich Were Not Treating Sources

Joseph next claims that the ALJ erred in failing to accord Brune and Kauzlarich the status of "treating sources," or otherwise give their opinions controlling weight. The Court finds that, even if Brune and Kauzlarich should have been considered treating sources, the ALJ did not err in giving their opinions less than controlling weight.

A treating source's opinion on the nature and severity of an impairment will be given controlling weight when "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record[.]" 20 C.F.R. § 404.1527(c)(2). Social Security regulations define a "treating source" as a claimant's physician, psychologist, or other "acceptable medical source"

who has provided the claimant with medical treatment or evaluation and has an ongoing treatment relationship with the claimant. § 404.1502. Acceptable medical sources are distinguished from "other sources." *Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007); § 404.1502. Acceptable medical sources include, among other things, licensed physicians and licensed or certified psychologists. *Sloan*, 499 F.3d at 888; § 404.1513(a). Other sources include both "medical sources" such as nurse practitioners and physicians assistants, and "non-medical sources" such as teachers and social workers. *Sloan*, 499 F.3d at 888. Only an acceptable medical source may be considered a treating source. *Id.*

Considered separately, neither Brune or Kauzlarich were treating sources. Kauzlarich did not meet with or treat Joseph often enough to have a treatment relationship. *See* § 404.1502. And as an APRN, Brune was not an acceptable medical source. However, where an acceptable medical source such as a psychologist works with "other" medical sources as part of a "treatment team," the entire team may be accorded treating source status. *Shontos v. Barnhart*, 328 F.3d 418, 426–27 (8th Cir. 2003); *see also Lacroix v. Barnhart*, 465 F.3d 881, 886 (8th Cir. 2006). Joseph asserts that Brune and Kauzlarich worked as a team, and argues they should be considered treating sources. *See* T577.

But even if that were the case, the ALJ did not err in assigning less weight to the opinions of Brune and Kauzlarich. An ALJ may reject the opinion of a treating source where the limitations described by the source are not mentioned in the treatment records, nor supported by reasoning or objective testing. *See Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005). And as the Court explained above, the ALJ properly discounted the opinions of Brune and Kauzlarich for just such reasons.

## C. Activities of Daily Living

Joseph next argues that the ALJ erroneously equated his activities of daily living with an ability to sustain full-time work. However, Joseph has misconstrued the ALJ's findings. The ALJ considered Joseph's activities of daily living, but never stated that these alone showed he was capable of working, nor that these translated to any particular RFC. Instead, the record shows that the ALJ considered Joseph's activities of daily living as part of the record as a whole: together with his treatment records, the notes of the LFS social workers, and all of his reported activities, including his past work experience. *See* T14–18. These activities did not prove Joseph could work, but they did demonstrate that his ability exceeded his self-reported limitations,

which the ALJ took into account in weighing Joseph's credibility. This argument is without merit.[16]

### D. The ALJ Did Not Err in Weighing the Statements of Joseph's Grandmother and Janette Bentley

Joseph next argues that the ALJ erred in affording "substantial weight" to the statement of his grandmother and Janette Bentley, and that their statements do not support the ALJ's findings. The Court finds no error in this regard. Substantial evidence would have supported the ALJ's decision even if she had completely disregarded the opinions of Joseph's grandmother. Nor has Joseph pointed to any additional limitations in his grandmother's letter that the Court finds persuasive. Joseph claims that the ALJ erred in finding that Bentley's opinion supported a finding that Joseph could work. But the ALJ did not utilize Bentley's opinion to determine what Joseph *could* do; rather, the ALJ considered Bentley's opinion to be credible evidence of limitations on his ability to work. T16.

### E. The ALJ Did Not Err in Failing to Articulate a Function-by-Function Analysis of Joseph's RFC

Finally, Joseph argues that the ALJ erred by failing to perform a "function-by-function" analysis of his RFC. As discussed above, the RFC determination for mental impairments involves a detailed assessment that itemizes the broad paragraph "B" criteria used at step two. *See*, §§ 404.1545(c) and 404.1569a(c); SSR 96-8p. But there is a difference between what the ALJ must consider and what the ALJ must explain. The ALJ's opinion shows that she understood the requirements of SSR 96-8p and carefully considered all of the limitations suggested by Joseph and his treatment providers, and incorporated those she found credible into the RFC. T14–18. But the ALJ was not required to make explicit findings for every aspect of Joseph's RFC. *Depover v. Barnhart*, 349 F.3d 563, 567–68 (8th Cir. 2003); *see also Bayliss*, 427 F.3d at 1217. This final argument is also without merit.

### CONCLUSION

The Court has reviewed the administrative record and finds that the ALJ did not err in any of the ways asserted by Joseph. The Court therefore

---

[16] The ALJ did state that Joseph could manage his own money, which is not borne out by the record. T216–17. But Joseph has not shown how he was prejudiced by this misstatement, and the Court finds that any error was harmless. The ALJ otherwise properly summarized Joseph's activities of daily living and did not afford them undue weight.

concludes that the Commissioner's decision was supported by substantial evidence and should be affirmed.

IT IS ORDERED:

1.      The Commissioner's decision is affirmed;

2.      Joseph's complaint is dismissed;

3.      The parties shall bear their own costs; and

4.      A separate judgment will be entered.

Dated this 26th day of April, 2013.

BY THE COURT:

John M. Gerrard
United States District Judge